Karen PINCHBACK

v.

ARMISTEAD HOMES
CORPORATION, Diane Dailey

Civ. No. B–81–1334.

United States District Court,
D. Maryland.

June 23, 1988.

WALTER E. BLACK, Jr., District Judge.

Plaintiff Karen Pinchback[1] brings this action against defendants Armistead Homes Corporation ("Armistead") and Diane Dailey, alleging that defendants discriminated against her on the basis of race in the sale of housing by depriving her of a residence in the Armistead Gardens development in Baltimore, Maryland. The Court has conducted a bench trial in this case and herein states its findings of fact and conclusions of law. Pinchback states causes of action under 42 U.S.C. §§ 1981 and 1982 and under Section 25 of Article 49B of the Annotated Code of Maryland.[2] Armistead has filed a third-party complaint against Roy E. Jones Real Estate, Inc. ("Jones Real Estate"), Dailey's former employer, in which it seeks indemnification. Jones Real Estate was originally sued by Pinchback as well, but Pinchback entered into a Consent Decree with this party, as well as with Roy E. Jones and Diamond Realty, Inc., which released these three parties from being defendants in this case. Melvin Maeser, Armistead's former general manager, was also originally sued by Pinchback, but she dismissed her case against him on the first day of the trial. At trial, neither Dailey nor a representative of Jones Real Estate was present to defend their respective interests, and the Court directed the Clerk to enter a default against these two parties.

## FINDINGS OF FACT

### I.

On February 14, 1980, Pinchback, who is black, read a classified advertisement in the Baltimore Sun for a house for sale. At the time, Pinchback was interested in buying a house with her then-husband, Charles Pinchback. The advertisement, in relevant part, read as follows:

Leslie L. Gladstone, Baltimore, Md., and Kerry Alan Scanlon, Robert F. Leibenluft, William A. Bradford, Jr., and Bradley Saxton, Washington, D.C., for plaintiff.

Bernard J. Sevel, and Marc K. Sloane, Baltimore, Md., for defendant Armistead Homes Corp.

1. Since the filing of this action, plaintiff has taken the surname of Bowman. To avoid confusion with the pleadings and other papers filed in this case, the Court will continue to refer to plaintiff by her former name, Pinchback.

2. Plaintiff's original complaint also included a count under the Fair Housing Act of 1968, 42 U.S.C. § 3604. The Court dismissed this count on statute of limitations grounds.

ROY E. JONES

ONLY $12,000! The buy of the day! Fantastic starter home. Very little needed to buy. Owners will finance. 682–2060.

No mention was made in the advertisement of who owned the house or where it was located. The phone number listed in the advertisement was that of Jones Real Estate, the third-party defendant in this case.

Finding the advertised property appealing, Pinchback responded to the advertisement by telephoning Jones Real Estate on the evening of February 14. She reached an answering machine and left a message indicating her name, telephone number, and that she was responding to the advertisement. The next day, February 15, 1980, Dailey, a real estate agent then employed by Jones Real Estate, returned Pinchback's call. Dailey and Pinchback discussed the advertised property. Dailey informed Pinchback that the house was located in Armistead Gardens. Dailey further informed Pinchback that she would only have to pay $1,000 for the down payment and that the financing payments would be $230.00 per month. The two women arranged to meet the following day, Saturday, February 16, at noon at Jones Real Estate, so that Dailey could take Pinchback to see the house. Dailey gave Pinchback the address of the Jones Real Estate office.

On the 16th, Pinchback and her husband attempted to drive to Jones Real Estate for the noon appointment with Dailey. Unfortunately, they lost their way. Unable to find Jones Real Estate, Pinchback and her husband returned home. Upon her return home, Pinchback called Dailey to make another appointment to see the house. The Court finds that, in substance, the following conversation then took place. After hearing Pinchback's request for another appointment to see the house, Dailey asked Pinchback whether she was black. Shocked, or in her words, "torn apart," by the question, Pinchback responded that she was black. Dailey then said that she was sorry, but that it was Armistead's policy that blacks were not allowed in the community. At trial and in her deposition, Pinchback had some difficulty remembering the precise exchange between herself and Dailey. The Court, however, finds her to be a highly credible witness, and the substance of this critical testimony is accepted as true. Thus, it is the Court's finding that Dailey did in fact ask Pinchback whether she was black, and that Dailey did in fact inform Pinchback that it was Armistead's policy that blacks were not allowed in the community. The Court further finds that Pinchback relied on this information and never pursued living in Armistead Gardens any further.

Dailey did not inform Pinchback of the application procedure at Armistead. Nor did Dailey specify whether she was representing a single homeowner in Armistead Gardens or Armistead itself. After stating Armistead's racial policy, Dailey offered to show Pinchback some other houses. Pinchback accepted the offer, and they arranged to view several other houses that weekend.

Pinchback was led to believe that Dailey was a representative of Armistead by Dailey's reference to Armistead's racial policy. The Court does not find, however, that an Armistead representative directly conveyed any information to Dailey about a discriminatory policy at Armistead. Dailey did have a conversation with Mary Reynolds, Armistead's transfer agent, in which Reynolds informed Dailey of the procedures for purchasing a leasehold interest at Armistead Gardens.

Pinchback met with Dailey to view several other houses that weekend, none of which were in Armistead Gardens. Pinchback did not like any of the houses that she was shown. After seeing the houses that weekend, Pinchback and Dailey had no further contact.

In February of 1980, Pinchback was employed and earned approximately $102.50 per week, before taxes. Pinchback's husband was also employed, and he earned approximately $200.00 per week, after taxes. Pinchback testified that a friend could have assisted her in making a down payment on a house.

Pinchback and her husband were paying rent of $285.00 per month in February of 1980. The pair separated in September of 1980. Pinchback paid rent of $301.00 per month between the years 1981 and 1984. Starting in 1985, Pinchback's rent increased to $378.00 per month. Pinchback testified that on November 1, 1987, her rent would increase to $404.00 per month.

## II.

Armistead is a cooperative housing development that was formed in 1955. The property commonly known as Armistead Gardens was purchased from the federal government in 1956. The corporation is not designed to make a profit and exists to serve the Armistead Gardens community. There are 1,518 individual leasehold properties located in Armistead Gardens. Each leasehold owner holds a certificate of membership in Armistead and is referred to as a "member." Armistead—not the members—owns the real estate. Each member receives initially a ninety-nine year lease with a right to renew. Members pay monthly charges to Armistead for electricity, water, gas and repair work. Armistead has a Board of Directors and several committees, including a Membership Committee. The Board, elected by the entire Armistead membership, and all committees are comprised solely of members. The Board of Directors holds monthly meetings open to all members. Board meetings are taped by the Secretary of the Corporation.

When a member desires to sell or transfer his leasehold interest, he may contact a real estate agent to assist in locating a buyer, or he may locate a buyer himself. Armistead does not directly assist members in the sale of their leasehold interests but, at the request of a member, Armistead will put a property to be sold on a "for sale list" that is kept at the Armistead office in Armistead Gardens. The "for sale list" is maintained by the transfer agent, an employee of Armistead. Once a buyer is found, the member must give Armistead the opportunity to exercise the right of first refusal that it holds under the By–Laws of the Corporation. The By–Laws give Armistead thirty days after being in-

formed of the price a buyer is willing to pay to match the buyer's offer. Armistead need not be given this opportunity, however, if the sale or transfer is to an immediate family member.

In addition to the right of first refusal, Armistead makes the final determination whether a prospective buyer may become a member of Armistead and, thereby, be able to own a leasehold interest. Once a member has found a prospective buyer to whom he is willing to sell, Armistead requires that the prospective buyer fill out a membership questionnaire form. In the form the prospective buyer is asked to provide information about his residential history, his current employment and income, his savings and credit, his family composition, and references. The prospective buyer must also pay $30.00 for the review of his application, half of which is paid to the Credit Bureau of Baltimore for a credit check of the prospective buyer, and half of which is paid to those members of the Membership Committee that interview the prospective buyer.

When the Membership Committee receives an application from a prospective buyer, typically two members of the Committee arrange to meet the prospective buyer at his home. The purpose of the meeting is to get to know the prospective buyer and to see how he lives. There are no written criteria for reviewing prospective buyers. One Board member, Melvin Maeser, testified that "they look for people who will fit into the community." If the Committee approves a prospective buyer, that person must still meet the Board of Directors' approval before he can become an Armistead member.

Once a prospective buyer has been approved by the Membership Committee and the Board of Directors, settlement can occur. At settlement, which is attended by the buyer, the seller, and an Armistead representative, the buyer and seller enter into a leasehold agreement, and the buyer is given a copy of the purchase agreement and a membership certificate. As part of the leasehold agreement, the buyer agrees

to adhere to the provisions of a document known as the Conditions of Dwelling Leaseholds. These conditions may be altered by the Board from time to time, so that it is possible that a new leasehold owner may be subject to different conditions than were imposed on the prior leasehold owner.

The leasehold interest in the advertised property in Armistead Gardens concerning which Pinchback called Jones Real Estate was at that time owned by Kathleen Ziemski. Ziemski had contracted with Jones Real Estate to have the property listed for sale. Ziemski was offering to sell the leasehold interest for $12,000, with a $1,000 down payment.

### III.

Armistead Gardens is, and always has been, a white community. While there have been several black people who have lived in Armistead Gardens, and there have been several black employees of Armistead, to this day there has never been a black leasehold owner at Armistead Gardens. This is true even though there are several black neighborhoods adjacent to Armistead Gardens. These facts are relevant to plaintiff's claim, although they do not necessarily indicate that Armistead has been discriminating against blacks. There are a number of virtually all-white neighborhoods in the Baltimore area that border virtually all-black neighborhoods, and this alone does not prove discrimination by the white neighborhood or, for that matter, by the black neighborhood. Of course, Armistead Gardens is more than just a neighborhood; it is a cooperative housing development where the members, through the Membership Committee and the Board of Directors, determine who is, and who is not, permitted to become an Armistead leasehold owner.

The Court was presented with little evidence establishing that Armistead actually refused to approve the leasehold application of a black person. The testimony of Aaron McRae, a Housing and Urban Development investigator, was the only evidence presented by plaintiff directly on this issue.[3] McRae testified on cross-examination that in the course of investigating plaintiff's claim, he phoned the Armistead office manager and was told that blacks had applied to live in Armistead Gardens but that none had been approved. Highly compelling evidence was presented, however, demonstrating that had black prospective buyers submitted membership applications to live at Armistead Gardens, they would have been refused membership because of their race. The bulk of this evidence was presented through the testimony of Diana Lynn Ward and Margie Conant, two Armistead members.

Ward has been an Armistead leasehold owner since August of 1981. She also lived in Armistead Gardens as a child for four years, and she lived there from 1975–77 as well. Ward served on the Armistead Board of Directors from June of 1983 until June of 1987. For two of her years on the Board, Ward was Vice–President of the Corporation, and for one year, she served as the Corporation's Secretary. Ward also served on the Recreation Committee from 1982–87. Ward testified unequivocally that every Board of which she has been a member has discussed how to keep blacks out of Armistead Gardens. Specifically, Ward recounted the following incidents.

Ward testified that when she purchased her leasehold interest in 1981, Dailey was the listing agent who assisted her in the purchase. At the closing, Ward recounts that either Dailey or Jack Funari, then an active Board member, told Ward that she did not have to worry, because there were "no niggers in Armistead." Ward testified that, at several Board meetings in 1975 and 1976, Board members discussed the effect of the posting of signs by realtors in yards

---

**3.** The Court was also presented with evidence that, in 1983, a Hearing Examiner of the Maryland Commission on Human Relations found that Armistead had unlawfully discriminated against Lorenzo Buckner, a black male, on the basis of race, by depriving him of the opportunity to live in Armistead Gardens in 1975. The Court admitted this evidence solely for the purpose of demonstrating that defendant was on notice regarding allegations of racial discrimination at the time the incidents concerning the plaintiff in this case took place.

in Armistead Gardens indicating houses for sale, and that the Board members were concerned that such signs would lead to blacks wanting to live in Armistead Gardens.

Ward testified that while she was on the Recreation Committee, she was responsible for scheduling functions at a meeting hall on the Armistead property. On one occasion a Mrs. Brown, who was a white non-member who had a member sponsoring her to allow her access to the hall, wanted to use the hall to have a function at which blacks would be in attendance. Ward testified that she heard Funari, a Board member, tell Brown that it would be over his "dead body" that "niggers" would be allowed to use the hall.

Ward also testified that she was present in the Armistead office with Funari when a black person came in to inquire about available housing at Armistead Gardens. After the inquirer was told that she would have to pursue obtaining a house from a current leasehold owner, Ward asked Funari why the inquirer was not told about the existence of a fund to assist her with financing. Funari responded that "we don't need any niggers."

Ward testified that several leasehold owners threatened Fred James, then the President of the Armistead Board, that they would sell their property to blacks, and that on each occasion James responded that they would have to go through the membership review and the credit check first, clearly implying that they would not successfully do so. Ward also testified that in 1984 or 1985, the then Board President, Bert Jones said, in reference to Pinchback's case, that "if we don't beat this case, we'll have every nigger in Baltimore coming here."

Ward testified that the Board took precautions not to memorialize certain portions of their discussions; the tape recorder that was otherwise operating during Board meetings was turned off when this case or blacks generally were being discussed. Ward specifically recalls an off-the-record meeting about this case that was held directly after a regular Board meeting.

Ward also recalls that the tape was erased on one occasion after a Mr. Schultz used the word "nigger."

The Court recognizes that Ward would appear to bear a grudge against Armistead and certain Armistead members. Ward testified that Armistead is divided into two political factions and that in a recent Board election, Ward was ousted from her place on the Board. On cross-examination, it was revealed that Armistead sought and obtained an injunction in the Circuit Court for Baltimore City to prevent Ward from entering Armistead's corporate offices. Ward also testified that she is upset that Armistead will not allow her to enclose her yard to protect her autistic son, and that Armistead has failed to repair her roof that is "caving in." The Court finds, however, that rather than demonstrating a lack of credibility, Ward's state of mind led her to "turn in" her fellow members. The Court found Ward to be credible, and her testimony as recounted herein is accepted as fact.

The Court also found Margie Conant, another Armistead Board member who testified as to a number of racially offensive remarks concerning keeping blacks out of Armistead, to be credible. Conant has lived in Armistead Gardens since 1961 and has served on the Board since 1968, except for a three-year period. Conant served as President of the Corporation between July 1986 and June 1987, and she has served as Vice–President, Secretary, Assistant Secretary, Treasurer, and Assistant Treasurer. Conant has attended virtually all Board meetings since she has been on the Board. Conant testified that on a number of occasions at Board meetings, members would state their opinions about keeping blacks from becoming leasehold owners at Armistead.

Specifically, Conant testified that approximately one and a half years ago, Board member Gloria Fernandes, stated in a Board meeting—in connection with a discussion of this case—something to the effect of "we don't want any blacks in Armistead." Conant testified that over two years ago, Tony Schultz Anton, a Board member at the time, voiced the same con-

cern in a Board meeting, although not in reference to this case. Conant further testified that both Fred James, while President of the Corporation, and Lillie May Evans, while a Board member, stated that blacks had to be kept out of Armistead.

Conant also testified that because all of these comments took place during Board meetings, they all should have been recorded. Conant stated that she does not know whether the comments are still on tape but knows that there were occasions when the President or the Secretary of the Corporation ordered that the tape be erased. Conant recalls one such occasion when Fernandes commented on keeping blacks out of Armistead. Since the Court found Conant's testimony extremely credible, her testimony as recounted is accepted as fact.

The Court also finds that the following incident occurred. In August of 1984, Teresa Coursey, then a leasehold owner at Armistead Gardens, decided to sell her property. She contacted Helen Poska, the editor of *The Representative*, a local newspaper, about running an advertisement regarding the sale of her leasehold interest. While not directly connected with Armistead, *The Representative* printed the Armistead Board minutes and frequently printed advertisements of property for sale in Armistead. Poska was a member of the Armistead Board at the time and has served on the Board for seventeen of the last twenty years. After Coursey told Poska how the advertisement should read, Poska asked Coursey what she would say if a black applied. Coursey was shocked by the inquiry and responded that she would treat a black applicant no differently from a white applicant.

Armistead called Melvin Maeser and Helen Poska, two long-time Armistead Board members, as witnesses to rebut Ward's and Conant's testimony regarding the collective attitude and specific remarks of Armistead Board members about keeping blacks out of Armistead. The Court did not find Maeser's flat denial that such statements took place in his presence at Board meetings to be credible. Nor did the Court find Poska's statement that, other than the re-

mark attributed to Gloria Fernandes by Margie Conant, there were no such statements uttered in her presence at Board meetings to be credible. The Court places their testimony with the more blatantly incredible deposition testimony of Lillie May Evans who confirmed that in the twenty-five years that she has lived in Armistead Gardens, she has no recollection of ever speaking to any other Armistead Gardens resident about anything having to do with race or blacks.

The Court accepts as fact the testimony of Audrey Moffit, Armstead's current office manager, regarding the application of Robert Brown, a black prospective buyer. According to Moffit, Brown's membership was approved in 1984, but sometime after approval, Brown's white girlfriend bought the property in question. The Court notes that while Moffit did state that an investigation was done on the application and that it was approved, it is unclear whether Brown was visited by members of the Membership Committee or whether he subsequently received the approval of the Membership Committee and the Board of Directors.

During the years 1979, 1980 and 1981, the Armistead Board consisted of between fifteen and eighteen members. Fred James was President of the Corporation all three years. Lillie May Evans was Assistant Secretary all three years. Helen Poska was a Board member for the years 1979 and 1980. Jack Funari and Gloria Fernandes were Board members in 1981. During the same three years, the Membership Committee consisted of two people in 1979, three people in 1980 and five people in 1981. For all three years, Lillie May Evans was on the Committee, and in 1979 and 1980, she served as the Committee's Chairperson. In 1981, Jack Funari was also on the Committee.

Pinchback has not established how each member of the Membership Committee or the Board of Directors would have acted on Pinchback's application had she applied. No such showing is necessary, however. Based on the testimony adduced at trial, the Court finds that the Armistead Board

as a collective group was hostile to blacks at the time Pinchback was interested in purchasing property in Armistead Gardens. Thus, the Court finds that had Pinchback applied to live at Armistead Gardens, she would have been denied membership because she is black.

The Court also received evidence regarding the racial reputation of Armistead Gardens in the community. Plaintiff introduced into evidence the notes of HUD investigator McRae's meeting with Dailey and the office manager of Jones Real Estate. The meeting took place on August 8, 1980. McRae's notes indicate that the office manager stated that she "had heard through the years of Armistead Gardens all-white population, but didn't know it for a fact." In deposition, Melvin Maeser, a long-time resident of Armistead Gardens, stated that Armistead Gardens "is basically known as a white community." At trial, Maeser elaborated on his deposition remark and said that before he came to Armistead Gardens, he had heard it was a place for

"poor, white trash; white hillbillies." Based on this evidence, the Court finds that, to the extent a development possesses a reputation in the community, at all times relevant to this case, Armistead Gardens had a reputation for being all-white.

## CONCLUSIONS OF LAW

Pinchback asserts causes of action under 42 U.S.C. §§ 1981[4] and 1982[5], and under Article 49B of the Annotated Code of Maryland.[6] To prevail against Armistead under any of these claims, Pinchback must prove by a preponderance of the evidence that Armistead deprived her of the opportunity to acquire property at Armistead Gardens, and that Armistead did so because Pinchback is black. Armistead strenuously argues that because Pinchback never applied to Armistead, she has failed to make a prima facie showing of discrimination against her by Armistead.[7]

In support of its position, Armistead offers a four-part test for establishing a pri-

---

**4.** 42 U.S.C. § 1981 provides:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

**5.** 42 U.S.C. § 1982 provides:

All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property.

**6.** Section 25 of Article 49B of the Annotated Code of Maryland provides:

It shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by § 20, § 21, § 22, or § 23 of this article. This section may be enforced by appropriate civil action.
Section 20(a)(1) provides:
(a) It shall be an unlawful discriminatory housing practice, because of race, color, religion, sex, national origin, marital status, or physical or mental handicap, for any person

having the right to sell, rent, lease, control, construct, or manage any dwelling constructed or to be constructed, or any agent or employee of such person:
(1) To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling.

**7.** Armistead has not asserted that Pinchback lacks standing to sue. Because the standing doctrine limits the subject matter jurisdiction of this Court whether it is raised by a party or not, and because the facts of this case naturally call Pinchback's standing into question, the issue must now be addressed. While the standing doctrine as developed by the Supreme Court is multi-faceted, it would appear that the only facet at issue in this case is whether Pinchback has alleged personal injury fairly traceable to Armistead's unlawful conduct, so as to satisfy the Article III case and controversy requirement. *Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556, 570 (1984). At the risk of putting the cart before the horse, the Court will not now embark on an analysis of the traceability of Pinchback's claim to Armistead's conduct, but will instead incorporate the forthcoming analysis of Armistead's liability, in which the Court finds Armistead liable for the discriminatory injury suffered by Pinchback. Because the Court so finds, the Court *a fortiori* finds that Pinchback has standing to bring this action.

ma facie case of housing discrimination. The test is a modified version of the one employed by the United States Court of Appeals for the Second Circuit in *Robinson v. 12 Lofts Realty, Inc.*, 610 F.2d 1032, 1038 (2d Cir.1979), which was derived from the test established by the Supreme Court in the seminal employment discrimination case of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668, 677 (1973):

(1) That the Plaintiff must be a member of a protected class;

(2) That he applied for and was qualified to purchase housing;

(3) That he was rejected; and

(4) That the housing opportunity remained available.

Armistead would have the Court simply apply this test, find that at least one of the elements has not been established, and rule in favor of Armistead.

In adopting this position, Armistead had failed to grasp the purpose of the prima facie test in discrimination cases. The purpose of the *McDonnell Douglas* test is to allow the plaintiff the opportunity to create a rebuttable inference of discrimination, without necessarily offering any direct proof of discrimination. Significantly, the elements of the test are not fixed. As the Supreme Court said in *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 358, 97 S.Ct. 1843, 1866, 52 L.Ed.2d 396, 429 (1977), another employment discrimination case, "[t]he importance of *McDonnell Douglas* lies, not in its specification of the discrete elements of proof there required, but in its recognition of the general principle that any Title VII plaintiff must carry the initial burden of offering evidence adequate to create an inference that an employment decision was based on a discriminatory criterion illegal under the Act." Moreover, as the United States Court of Appeals for the Fifth Circuit reasoned, "courts must not allow the mechanical formula to blind them to the real issue of whether the defendant illegally discriminated against the plaintiff...."

In the rare situation in which the evidence establishes that an employer openly discriminated against an individual, it is not necessary to apply the mechanical formula of *McDonnell Douglas* to establish an inference of discrimination; the showing has already been made." *Ramirez v. Sloss*, 615 F.2d 163, 168 (5th Cir.1980).

There is no question that Pinchback must establish two threshold facts in order to prevail in this case. If she is not a member of the protected class, or if she was not a bona fide buyer at the time she inquired about the home in Armistead Gardens, she cannot recover. Pinchback, as a black person, is indeed in the protected class. Whether she was a bona fide buyer at the time of inquiry will be addressed shortly. The central issue, however, is what else must Pinchback prove? The Court has found that Armistead would have denied Pinchback membership on the basis of her race had she formally applied to Armistead. The Court has also found that Pinchback never did formally apply for membership at Armistead. In fact, Pinchback had no direct contact whatsoever with the Armistead Gardens property or any Armistead members or employees. Armistead would have the Court require that Pinchback prove that she applied to live at Armistead. In the Court's view, such a requirement is too inflexible and is inconsistent with the dictates of *McDonnell Douglas* and its progeny. The real issue is *whether Armistead actually discriminated against Pinchback*, and that is what she must prove to prevail in this case.[8]

■ Before reaching this issue, the Court must consider whether Pinchback was a bona fide buyer at the time she inquired about the leasehold interest for sale at Armistead. In February of 1980, the Ziemski property was for sale for $12,000, with a $1,000 down payment. The remainder of the amount was to be paid off at a rate of no more than $230.00 per month. Pinchback was then employed at a rate of $102.50 per week, before taxes, and her husband was employed at a rate of

---

8. Having focused directly on what Pinchback must prove to prevail in this action, the Court need not engage in the standard three-stage proof scheme set forth in *McDonnell Douglas*.

$200.00 per week, after taxes. Pinchback testified that a friend was prepared to assist her in making a down payment. As it appears that Pinchback and her husband were earning over four times the $230.00 monthly payment and had a friend available to assist with a down payment, the Court finds that Pinchback was capable of buying the property in question. Additionally, given the excess of Pinchback's and her husband's income over the monthly payment, the Court finds that Pinchback had the means to make the monthly payments to Armistead for electricity, water, gas and repair work.

Turning now to the critical issue in this case, Pinchback articulates three theories in support of finding Armistead liable for discriminating against her in the sale of housing on the basis of race. First, Pinchback asserts that Dailey was an agent—either actual or apparent—of Armistead and that Dailey's remarks to Pinchback should therefore be attributed to Armistead. Second, Pinchback argues that the Court should adopt a line of authority in the employment discrimination field, beginning with the case of *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 366, 97 S.Ct. 1843, 1870, 52 L.Ed. 2d 396, 434 (1977), holding that where application for a position would be a futile gesture, nonapplication is not a bar to recovery. Under the *Teamsters* approach, Pinchback asserts that so long as she proves that she would have applied but for the discrimination and that she would have been discriminatorily rejected had she applied, she should be on equal footing with an actual applicant. Third, Pinchback contends that Armistead proximately caused the injuries suffered by her and that on this basis, Armistead should be held liable for discrimination under the asserted statutory claims.

Beginning with plaintiff's agency theory, there is no question that at the time Dailey talked to Pinchback in February of 1980, she was already acting as the agent of two principals: Jones Real Estate, her employer, and Kathleen Ziemski, the owner of the property for sale in Armistead Gardens. Pinchback would have the Court find that Dailey served yet another principal in Armistead, either as an actual agent or an apparent agent.

An actual agency exists when there is a "fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." *In re Shulman Transport Enterprises, Inc.*, 744 F.2d 293, 295 (2d Cir.1984) (quoting *Restatement (Second) of Agency* § 1(1) (1958). In contending that such a relationship existed between Armistead and Dailey, Pinchback focuses on Armistead's interest in its members transferring their property. It is undisputed that Armistead played a role in the leasehold transfer process. It employed a transfer agent who provided information to members, realtors and prospective buyers regarding the transfer process. It kept a list of properties for sale at its office. It reviewed the prospective buyers to determine whether they were worthy of credit and were suitable persons. It played an active role in the settlement and, as Pinchback stressed at trial, had the ability to alter the Conditions of Dwelling Leaseholds document so that a new leasehold owner could agree to different terms with Armistead than existed between the prior owner and Armistead. In essence, Pinchback argues that because Armistead played an active role in the transfer process and because it was in Armistead's interest to have the leasehold transfers occur, that therefore Dailey acted as agent for Armistead as well as Ziemski.

■ The record, however, is devoid of any evidence that Armistead consented to have Dailey act on its behalf and subject to its control or that Dailey agreed to act on behalf of Armistead and subject to its control. Armistead's interests may have been consistent with those of Ziemski or Roy Jones Realty, but that does not make Dailey an agent of Armistead. Accordingly, the Court does not find that Dailey served as Armistead's actual agent in the sale of the Ziemski property.

■ Whether Dailey served as an apparent agent of Armistead, rather than an actual agent, depends on different considerations. "Unlike actual agency, which exists whether or not the third party knows of or suspects an agency relationship, apparent agency depends in large part upon the representations made to the third party and upon the third party's perception of those representations." *Williams v. Washington Metropolitan Area Transit Authority*, 721 F.2d 1412, 1416 (D.C.Cir. 1983). "Apparent authority exists only to the extent that it is reasonable for the third person dealing with the agent to believe that the agent is authorized. Further, the third person must believe the agent to be authorized." *Id.* at n. 7 (quoting *Restatement (Second) of Agency*, § 8 comment c). Significantly, "the creation and termination of apparent authority *rests with the principal.*" *Id.* at 1417 (emphasis added).

While the Court is prepared to find that Pinchback, after her phone conversations with Dailey, reasonably believed that Dailey was an agent of Armistead, there is no indication in the record that Armistead created this impression in Pinchback's mind. Armistead merely allowed its members independently to attempt to sell their property with the assistance of real estate brokers. The fact that Dailey gave Pinchback the impression that she was an agent of Armistead, without Armistead affirming this impression in any manner, cannot create a binding agency relationship between Dailey and Armistead. Thus, the Court does not find that Dailey served as an apparent agent of Armistead in the sale of the Ziemski property.

Pinchback's second theory of liability finds its origin in the Supreme Court decision of *International Brotherhood of Teamsters*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396. In *Teamsters*, the United States had brought an action under Title VII in a Tennessee federal court against T.I.M.E.–D.C., Inc., alleging that the company discriminated against blacks in its hiring, assignment and promotion policies at its Nashville terminal. The Government brought a second suit against the same company three years later in a Texas federal court, charging the company with a pattern and practice of employment discrimination against blacks and Spanish-surnamed persons throughout the company's transportation system. The International Brotherhood of Teamsters was joined as a defendant in the second suit. The two suits were consolidated in the Northern District of Texas.

The district court found that discrimination had occurred and accepted the Government's theory that the affected class of people discriminated against should include all black and Spanish-surnamed incumbent employees who had been hired to fill city operations or serviceman jobs at every terminal that had a line-driver operation. The district court found that members of this class had been injured in different degrees and divided the class into three groups for remedial purposes. Where there was no evidence that an individual class member had been harmed in terms of being deprived of a line-driver job, the district court put that class member in the third of three groups of workers to be considered for line-driver positions.

The United States Court of Appeals for the Fifth Circuit agreed that discrimination had occurred but ruled that the district court's remedial scheme was inadequate. Among other things, the Fifth Circuit did not distinguish on remedial grounds between incumbent employees who had applied for a job and those who had not. The Court held that where there has been a demonstration of class-wide discrimination coupled with a seniority system that perpetuates the effects of the discrimination, a member of the class need not show that he applied for the position from which the class had been excluded. The Court reasoned that "as a practical matter ... a member of the affected class may well have concluded that an application for transfer to an all White position such as [line driver] was not worth the candle." *United States v. T.I.M.E.–D.C., Inc.*, 517 F.2d 299, 320 (5th Cir.1975).

Although the Supreme Court vacated the decision of the Fifth Circuit, remanding the case to the District Court for an evidentia-

ry hearing on the remedial scheme, the Court agreed with the Fifth Circuit in principle regarding the propriety of relief for those class members who did not apply for the line driver positions. The Court began by citing its prior decisions in *Griggs v. Duke Power Co.*, 401 U.S. 424, 429–430, 91 S.Ct. 849, 853, 28 L.Ed.2d 158, 163 (1971) and *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 417, 95 S.Ct. 2362, 2371, 45 L.Ed.2d 280, 296 (1975), in which the Court noted that "a primary objective of Title VII is prophylactic: to achieve equal employment opportunity and to remove the barriers that have operated to favor white male employees over other employees." *Teamsters*, 431 U.S. at 364, 97 S.Ct. at 1869, 52 L.Ed.2d at 433. Referring again to *Albemarle*, the Court then stated that district courts have "not merely the power but the duty [under Title VII] to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar likely discrimination in the future." *Id.* (quoting *Albemarle Paper Co.*, 422 U.S. at 418, 95 S.Ct. at 2372, 45 L.Ed.2d at 297). Mindful of this statutory mandate, the Court reasoned as follows:

> The effects of and the injuries suffered from discriminatory employment practices are not always confined to those who were expressly denied a requested employment opportunity. A consistently enforced discriminatory policy can surely deter job applications from those who are aware of it and are unwilling to subject themselves to the humiliation of explicit and certain rejection.

> If an employer should announce his policy of discrimination by a sign reading "Whites Only" on the hiring-office door, his victims would not be limited to the few who ignored the sign and subjected themselves to personal rebuffs. The same message can be communicated to potential applicants more subtly but just as clearly by an employer's actual practices—by his consistent discriminatory treatment of actual applicants, by the manner in which he publicizes vacancies, his recruitment techniques, his responses to casual or tentative inquiries, and even by the racial or ethnic composition of that part of his work force from which he had discriminatorily excluded members of minority groups. When a person's desire for a job is not translated into a formal application solely because of his unwillingness to engage in a futile gesture he is as much a victim of discrimination as is he who goes through the motions of submitting an application.

431 U.S. at 365–66, 97 S.Ct. at 1870, 52 L.Ed.2d at 433–34. The Court went on to say, however, that a nonapplicant must demonstrate that he was a potential victim of unlawful discrimination. "Because he is necessarily claiming that he was deterred from applying for the job by the employer's discriminatory practices, his is the not always easy burden of proving that he would have applied for the job had it not been for those practices." 431 U.S. at 367–68, 97 S.Ct. at 1871, 52 L.Ed.2d at 435. Put another way, the Court stated that "[r]esolution of the nonapplicant's claim ... requires two distinct determinations: that he would have applied but for the discrimination and that he would have been discriminatorily rejected had he applied." 431 U.S. at 368, 97 S.Ct. at 1871, 52 L.Ed.2d at 436 n. 52. In keeping with this approach, the Court remanded the issue of the nonapplicant class members' remedial claims for a determination as to each individual's allegedly squelched desire for a line-driver position.

The "futile gesture" theory enunciated in *Teamsters* has been employed by numerous courts in employment discrimination cases to grant nonapplicants applicant status where the nonapplicant can demonstrate that he was deterred from applying because of discrimination and that had he applied, he would have been discriminatorily rejected. *White v. Carolina Paperboard Corp.*, 564 F.2d 1073, 1086 (4th Cir. 1977); *Equal Employment Opportunity Commission v. Sheet Metal Workers, International Association, Local No. 122*, 463 F.Supp. 388, 424–26 (D.Md.1978) (Miller, J.) (*Sheet Metal Workers*). The theory has been applied in individual as opposed to class actions, and it has been applied with regard to liability, rather than in the reme-

dial context. *Burkey v. Marshall County Board of Education*, 513 F.Supp. 1084, 1091 (N.D.W.Va.1981); *See also Rodgers v. Peninsular Steel Co.*, 542 F.Supp. 1215, 1218–19 (N.D.Ohio 1982) (Theory not applied because plaintiff alleged no awareness of job opportunity in question.). Moreover, the *Teamsters* approach has been applied by at least one court in a non-Title VII case. *McDermott v. Lehman*, 594 F.Supp. 1315, 1323 (D.Me.1984) (Applied to Age Discrimination in Employment Act claim.).

In several of the cases in which the futile gesture theory has been applied, the nonapplicant has been a current employee who has had an "inside" view of the alleged discrimination. *See White*, 564 F.2d 1073; *Burkey*, 513 F.Supp. 1084. In these cases, the issue was whether the nonapplicants, through the information they had obtained about their employers' hiring practices while on the job, had learned that their employers discriminated and that they would have been discriminated against had they applied for the positions in question. The same theory has been employed in the situation where the nonapplicant is not a current employee of the employer at issue, but has learned through contact with an agent of the employer that the employer discriminates against a protected class of which the prospective applicant is a member, and that to apply for the desired position would therefore be futile. *McDermott*, 594 F.Supp. at 1321–23.

Furthermore, in *Sheet Metal Workers*, 463 F.Supp. at 423–27, the *Teamsters* approach was applied where black sheet metal workers sought to demonstrate that a union's reputation among nonunion black sheet metal workers in the building trade was that it discriminated against blacks and that therefore they were deterred from applying for membership. In that case, the issue was whether the information circulating among the nonunion black sheet metal workers about the union was such that it reasonably resulted in their belief that to apply for membership would be a futile gesture because of the union's allegedly discriminatory membership policy. As the Court in *Sheet Metal Workers* stated, "the existence *vel non* of a defendant's reputation for discrimination is a relevant fact in determining whether an individual nonapplicant would have applied to the defendant but for the defendant's discrimination because it buttresses his testimony that he was aware of the discriminatory practices of the defendant." 463 F.Supp. at 426.

■ The case at bar presents somewhat different legal and factual circumstances than any of the cases outlined above. First of all, the plaintiff in this action has alleged housing discrimination, not employment discrimination. It is an issue of first impression whether the futile gesture theory enunciated in *Teamsters* is properly applied in a housing discrimination case. The Court can see no basis in principle for distinguishing between the prospective employee who claims he was dissuaded from applying for a job because of the discriminatory practices of an employer, and the prospective resident who claims he was dissuaded from applying for housing because of the discriminatory practices of the seller [9] of the housing. Moreover, because of the wide acceptance of other Title VII principles in housing discrimination cases—particularly the adoption of the *McDonnell Douglas* prima facie case analysis—it is the Court's view that the futile gesture theory is applicable in the housing discrimination context.[10]

---

9. Or, as the case may be, the entity that can control to whom the seller of the property sells.

10. Indeed, the futile gesture theory has been incorporated into the *McDonnell Douglas* analysis by at least one court:

Having alleged his deterrence from applying on the basis of the employer's discriminatory practices, it was then necessary in effect for such a plaintiff to substantiate this allegation. The plaintiff needed to show prima facie that he would have applied for the relevant position had it not been for those practices. *International Brotherhood of Teamsters v. United States*, 431 U.S. at 368, 97 S.Ct. at 1871. In meeting this burden, he essentially bridges the gap between applicant and non-applicant, and attains the presumption accorded the former upon fulfillment of the *McDonnell Douglas* prima facie case.

*Rodgers v. Peninsular Steel Co.*, 542 F.Supp. 1215, 1218–19 (N.D.Ohio 1982).

■ Factually, this case is distinct from any of the three types of cases described above where courts have applied the futile gesture theory. Pinchback was not already affiliated with Armistead in any capacity, so she did not observe Armistead's discriminatory practices firsthand. Nor did Pinchback hear about Armistead's no-black policy directly from an Armistead agent. Nor did Pinchback receive information regarding Armistead's general reputation in the community.[11] Pinchback received her information about Armistead from one source—Dailey.

It is not clear how Dailey received her information regarding Armistead's discriminatory policy. In the Court's view, this is not a critical evidentiary element. By maintaining a policy of discriminating against blacks, Armistead either directly or indirectly caused Dailey to become aware of this policy. Dailey, in turn, accurately conveyed that policy to Pinchback, a bona fide prospective leasehold buyer.

■ Significantly though, Dailey operated as an information source distinct from firsthand knowledge, or information provided by an agent, or through reputation. The critical question is whether Dailey was reasonably regarded by Pinchback as a reliable information source, thereby justifying Pinchback's decision to forego applying to Armistead Gardens. For whether the information source—be it firsthand knowledge, an agent, reputation, or otherwise—is reasonably regarded as reliable is a significant consideration that is implicit in all cases in which courts are asked to apply the futile gesture theory.

Dailey was the listing agent for the property. From Pinchback's or any other prospective purchaser's perspective, she was the sole person to contact regarding the advertised property. Moreover, Dailey, as a real estate agent, was a person properly assumed by Pinchback to be knowledgeable about local housing restrictions. The

Court concludes that Dailey was someone whom Pinchback could naturally be expected to rely on for information regarding a discriminatory housing policy at Armistead. Accordingly, the Court finds that Pinchback has met her burden of proof in this case, having demonstrated that she would have applied to live at Armistead but for the discrimination, and that she would have been discriminated against had she applied. Armistead therefore is liable to Pinchback under 42 U.S.C. §§ 1981 and 1982, and under Section 25 of Article 49B of the Annotated Code of Maryland.

Pinchback also argues as an alternative basis of liability that Armistead proximately caused the injury she suffered in being deprived of the property in Armistead Gardens because of her race and that, therefore, Armistead should be held liable. Because the Court has already found legal causation under the *Teamsters* approach, and a determination as to proximate cause was not necessary to that finding, it is not necessary for the Court to consider the proximate cause issue. In the interest of completeness, however, the issue will be addressed.

■ As a preliminary matter, courts routinely borrow from common law tort principles in fleshing out the civil rights statutes. *Curtis v. Loether*, 415 U.S. 189, 195–96, 94 S.Ct. 1005, 1009, 39 L.Ed.2d 260, 267 (1974). In the present case, if intentional discrimination is regarded as an intentional tort, the only outstanding issue is whether Armistead proximately caused the injury suffered by Pinchback. There is certainly no question that Armistead had a duty not to discriminate, that it deliberately breached that duty, and that Pinchback was injured.

While the Court has held that but for Armistead's discriminatory policy Pinchback would have applied for membership at Armistead, cause in fact cannot be equated with proximate cause. To demonstrate proximate cause there must be a showing

---

**11.** To the extent Armistead had a negative reputation in any part of the community regarding its policy towards blacks, it was that it was an all-white community. Knowledge of this reputation alone, without further knowledge that blacks are not allowed to live in Armistead, would not be sufficient to support a discrimination claim of a prospective applicant who chose not to apply on the basis of this information.

that the injury was reasonably forseeable. *Pierce v. United States*, 718 F.2d 825, 830 (6th Cir.1983). In the present case, the Court has no doubt that Pinchback's injury was reasonably forseeable to Armistead. Armistead carried out a discriminatory policy, fully aware that local realtors frequently visited Armistead and interacted with Armistead members, some of whom were members of the Board of Directors. It was quite forseeable that a realtor such as Dailey, who served as the listing agent for several Armistead homes, would acquire information about Armistead's policy of preventing black members. And it was no less forseeable that a realtor such as Dailey would convey this information to a prospective black purchaser such as Pinchback. After all, the information pertained directly to the ability of Pinchback, or any other black purchaser, to acquire property in Armistead. Accordingly, the Court also finds that under a proximate cause theory, Armistead is liable under the same three statutes—42 U.S.C. §§ 1981 and 1982 and Section 25 of Article 49B of the Annotated Code of Maryland.

■ Armistead makes what amounts to a last-ditch argument to avoid an adverse ruling by invoking the doctrine of release. Armistead asserts that because Pinchback entered into a Consent Decree releasing Roy E. Jones, and that Armistead would be entitled to indemnification from Jones were it not for the release, Armistead must also be treated as having been released. Leaving aside the issue of whether Armistead would be entitled to indemnification from Jones, even if this were assumed to be true, it does not follow that Pinchback cannot recover from Armistead.

Of significance in the present case is that the Consent Decree entered into by Pinchback and approved by the Court specifically states that plaintiff does not release the remaining defendants.[12] With regard to the claims under 42 U.S.C. §§ 1981 and 1982, the federal rule is that "a release of one joint tortfeasor or coconspirator is not a release of others unless the party signing the release intended the others to be released." *Locafrance U.S. Corp. v. Intermodal Systems Leasing, Inc.*, 558 F.2d 1113, 1115 (2d Cir.1977). As to the claim brought under Article 49B, by statute in Maryland "[a] release by the injured person of one joint tort-feasor, whether before or after judgment, does not discharge the other tort-feasors unless the release so provides...." Md.Code Ann., Art. 50, § 19 (1957, 1986 Repl. Vol.). This same statute further provides that any such release reduces the claim against the other tort-feasors by the amount paid for the release. *Id.* This reduction has no effect here, since it is inapplicable to the damages awarded on the federal claims. Thus, Armistead will not be shielded by the doctrine of release, and relief will be granted.

## DAMAGES

Pinchback seeks compensatory and punitive damages, affirmative relief to rectify Armistead's discriminatory practices, and attorneys' fees and costs. Beginning with Pinchback's claim for compensatory damages, her economic loss, if any, has not been established by a preponderance of the evidence. The Court should not speculate as to the duration of her stay in Armistead Gardens or as to the difference between the monthly rent payments Pinchback has made at several apartments since February of 1980, and the housing costs at Armistead Gardens.

■ The Court will award Pinchback compensatory damages for the humiliation and emotional distress she suffered due to Armistead's discriminatory practices. Pinchback was an earnest, prospective home buyer who was bluntly informed that the color of her skin precluded her from pursuing a leasehold interest at Armistead

---

12. The Consent Decree, approved by the Court on May 3, 1987, provides in relevant part that: Plaintiff does not release the remaining defendants, Armistead Homes Corporation, Melvin Maeser and Diane Dailey, from any present or future claims set forth in her Complaint or Second Amended Complaint or elsewhere, nor does this Consent Decree or any provision thereof in any way prejudice or prevent plaintiff from pursuing any present or future claims against such defendants.

Gardens. Armistead was responsible for this racist message, and Pinchback clearly suffered injury as a result of it. Accordingly, the Court will award Pinchback $2,500 in compensatory damages.

 The Court next considers whether to award punitive damages. Punitive damages are awarded in federal question cases when a defendant has acted "with actual knowledge that he was violating a federally protected right or with reckless disregard of whether he was doing so." *Miller v. Apartments and Homes of New Jersey, Inc.*, 646 F.2d 101, 111 (3d Cir.1981) (quoting *Cochetti v. Desmond*, 572 F.2d 102, 106 (3d Cir.1978); *Cf. Smith v. Wade*, 461 U.S. 30, 56, 103 S.Ct. 1625, 1640, 75 L.Ed.2d 632, 651 (1983) (Section 1983 case). Armistead has had a long-standing policy of discriminating against blacks. Armistead continued to implement this insidious policy, even after its first brush with the law in the *Buckner* case in 1975. It is appropriate, therefore, to attribute to Armistead actual knowledge of its violation of a federally protected right. At a minimum, Armistead acted with reckless disregard of whether it was violating a federally protected right.

In determining whether to impose punitive damages in this case, however, the Court recognizes the fact that Armistead is a housing cooperative. Accordingly, the burden of any such punitive damages will in all likelihood fall directly or indirectly on the 1,518 members, whether or not they share the racially discriminatory views held by its officers and representatives as reflected in the Court's findings of fact. The Court is also mindful that Armistead will be subject to substantial attorneys' fees as a result of the Court's ruling in this case. In litigation that has continued for more than seven years with 115 pleadings filed in Court and a trial lasting eight days, the Court is confident that Armistead's obligations in this regard will ultimately far exceed any punitive damages amount appropriate for this case. Accordingly, the purpose of punitive damages will have been accomplished, and no punitive damages will be awarded.

The Court finds that affirmative relief is appropriate in this case. Indeed, it is in this manner that the Court can be most effective in assuring the eradication of racial discrimination in Armistead Gardens. Entry of final judgment in these proceedings will be deferred until the Court has further guidance from the parties as to affirmative relief to be ordered.[13]

Finally, Pinchback is entitled to attorneys' fees and costs.

Judgment will be entered in accordance with this opinion.

---

13. In this regard, the Court has noted the evidence Pinchback presented at trial of an advertising test conducted by Baltimore Neighborhoods, Inc., which demonstrated that when Armistead-type homes were advertised in newspapers with a significant black readership and the advertisements included the words "Equal Housing Opportunity," a number of blacks responded with interest to the advertisements.