907 F.2d 1447
 59 USLW 2050
 Karen PINCHBACK, Plaintiff-Appellee,
v.
ARMISTEAD HOMES CORPORATION, Defendant-Appellant,
and
Melvin Maeser; Roy E. Jones Real Estate, Inc.; Roy E.
Jones; Diane Dailey; J.R. Diamond, Inc., Defendants,
v.
ROY E. JONES REAL ESTATE, INC., Third Party Defendant,
and
United States of America, Amicus Curiae.
 No. 89-2117.
 United States Court of Appeals,
Fourth Circuit.
 Argued Jan. 11, 1990.
Decided July 6, 1990.
 
 Bernard Jerome Sevel (argued), Bernard J. Sevel, P.A., Baltimore, Md. (Adam J. Sevel, Bernard J. Sevel, P.A., Baltimore, Md., on brief), for defendant-appellant.
 Robert Frederick Leibenluft (argued), Hogan & Hartson, Washington, D.C. (John C. Keeney, Jr., David W. Karp, Hogan & Hartson, Washington, D.C., Roderic V.O. Boggs, John P. Relman, Washington Lawyers' Committee For Civil Rights Under Law, Washington, D.C.), for plaintiff-appellee.
 James P. Turner, Acting Asst. Atty. Gen., Roger Clegg, Deputy Asst. Atty. Gen., Jessica Dunsay Silver, Thomas E. Chandler, U.S. Dept. of Justice, Washington, D.C., for amicus curiae.
 Before PHILLIPS and MURNAGHAN, Circuit Judges, and BUTZNER, Senior Circuit Judge.
 BUTZNER, Senior Circuit Judge:
 
 
 1
 In this appeal, we must consider whether the "futile gesture" theory applies to acts of housing discrimination. The district court concluded that it does and held Armistead Homes Corporation liable under 42 U.S.C. Sec. 1981, Sec. 1982, and Maryland law for denying Karen Pinchback housing opportunities because she is black. We find it unnecessary to determine liability under Maryland law, but in all other respects we affirm the judgment of the district court. See Pinchback v. Armistead Homes Corp., 689 F.Supp. 541 (D.Md.1988).
 
 
 2
 * This case is before us because of Karen Pinchback's efforts to secure suitable housing in Armistead Gardens, Baltimore, Maryland. Because the facts are discussed in great detail in the district court's opinion, we include only a brief summary.
 
 
 3
 Armistead exercised control over the composition of the Armistead Gardens community. Armistead Gardens is a cooperative arrangement made up of "members" who purchase 99 year leases from the corporation. The corporation retains a fee interest in the housing units and grants the members the right to renew their leases. When a member sells a unit, Armistead does little if anything to locate potential buyers. However, Armistead has the right of first refusal of any offer and can simply veto a sale. Armistead also has a membership committee, composed of residents, who screen prospective buyers by seeing them in person and making recommendations to Armistead's board of directors. The board exercises broad supervisory powers and must give its approval before a prospective buyer can become a member of the Armistead Gardens community. See 689 F.Supp. at 544-45. At the time of trial, Armistead Gardens was over 30 years old and never had a black member, although a few black persons had applied. See 689 F.Supp. at 545. The district court concluded Armistead Gardens was "more than just a neighborhood; it is a cooperative housing development where the members ... determine who is, and who is not, permitted to become an Armistead leasehold owner." 689 F.Supp. at 545.
 
 
 4
 Responding to an advertisement in a Baltimore newspaper for a "starter home" costing only $12,000, Pinchback phoned a real estate agent, Diane Dailey, who was employed by Roy E. Jones Real Estate, the firm retained by the seller of the home to find a buyer. Dailey arranged to show Pinchback the home. Pinchback missed the scheduled meeting but called Dailey again to set up another time. When Pinchback called, Dailey asked her whether she was black, and when Pinchback told her that she was, Dailey informed her that the community in which the home was located did not permit blacks to live there. That community was Armistead Gardens. Pinchback took Dailey at her word and assumed that the description of Armistead's policy was accurate. Dailey showed Pinchback some homes in other neighborhoods, but none interested her.
 
 
 5
 Pinchback reported the incident to an investigator with the Department of Housing and Urban Development. She then initiated this lawsuit against Armistead, Dailey, Jones Real Estate, and several of its officials, charging violations of her rights under Secs. 1981 and 1982, Title VIII, 42 U.S.C. Secs. 3601-31, and Maryland's fair housing law. As the case moved towards trial she eventually settled with all of the defendants except Armistead. The Title VIII claim was dismissed because the statute of limitations had run.
 
 
 6
 The district court conducted an eight day bench trial on the remaining claims. The court found that Armistead discriminated against blacks and injured Pinchback as a result. Pinchback was awarded $2,500, attorneys fees and costs. The court also ordered detailed injunctive relief designed to cure the racist policies it found at Armistead Gardens.
 
 
 7
 The district court applied the "futile gesture" or "futile act" theory developed in Title VII employment discrimination law to Pinchback's housing claims. The court found that Armistead had a discriminatory policy and would have rejected Pinchback had she actually applied for a leasehold interest at Armistead Gardens. The court also found that Pinchback would have applied but for the policy and was put off by a reasonably held belief that filling out and submitting an application was a waste of time. The court concluded that Armistead's discrimination injured Pinchback despite the absence of actual application and rejection. 689 F.Supp. at 554.
 
 
 8
 This conclusion turns on a number of specific factual findings. Armistead was found to have a policy of discriminating against blacks, which we discuss more fully in section II below. The court found that when Pinchback responded to the ad she was a potential bona fide purchaser who was financially able to buy the property and sincerely interested in it. 689 F.Supp. at 549-50. Importantly, the court considered whether Pinchback's reliance on Dailey's description of the policy reasonably deterred her from applying. Although Dailey represented the leasehold seller and had no official connection to Armistead, the court found that Pinchback "reasonably regarded" Dailey as a "reliable information source, thereby justifying Pinchback's decision to forego applying to Armistead Gardens." 689 F.Supp. at 554. The court also found Armistead to be the source, "directly or indirectly," of Dailey's information about the racist policy at Armistead Gardens. 689 F.Supp. at 554.
 
 II
 
 9
 Armistead first contends that Pinchback failed to prove Armistead discriminated against blacks. There was, in the words of the district court, "little evidence establishing that Armistead actually refused to approve the leasehold application of a black person." 689 F.Supp. at 545. Armistead suggests that evidence of this sort is necessary to prove that blacks receive discriminatory treatment, as it is hard otherwise to tell if blacks are considered by different criteria than white applicants. Armistead also argues that what other evidence there was of racism at Armistead proved only prejudice on the part of individual residents and officials, not a community policy of discrimination.
 
 
 10
 The record belies this argument. Two former members of Armistead's governing board, Diana Lynn Ward and Margie Conant, gave a detailed account of the board's hostility towards blacks. Their testimony reveals a singular anxiety on the part of the board over the prospect of blacks coming into the community. Ward and Conant each spoke of instances in which the board considered strategies at its regular meetings to keep blacks out. The discussions were usually deleted from the recordings made by Armistead of the meetings. The attitudes expressed went beyond mere personal prejudice, depicting the policy of Armistead itself. On several occasions, for instance, one board president intimated to residents that any attempt to sell property to blacks would be rejected by Armistead through the board's screening process and veto power. Ward also recounted that a board member declined to tell one prospective black applicant of financing help available through Armistead in order to discourage an application. There was testimony as well indicating that the board discussed how to target a white audience when advertising to the community. The board's attitude is best summarized by a former board president who said of this litigation, "if we don't beat this case, we'll have every nigger in Baltimore coming here." 689 F.Supp. at 546.
 
 
 11
 It seems quite clear that the district court correctly found a racially discriminatory policy at Armistead. The discrimination worked primarily to deter black interest in the community from ever forming. Its effectiveness is apparent. The district court chose to credit the testimony of the two insiders, Ward and Conant, observing that "the Armistead board as a collective group was hostile to blacks." 689 F.Supp. at 547-48. Their testimony was corroborated to an extent by a HUD investigator, who testified that the Armistead office manager informed him that although blacks had applied for membership at Armistead Gardens, none had been accepted. 689 F.Supp. at 545. The court characterized in part Armistead's rebuttal testimony as "blatantly incredible" and granted it little weight. 689 F.Supp. at 547. Armistead's challenge to the factual finding fails accordingly.
 
 III
 
 12
 Armistead also assigns error to the district court's adoption of the "futile gesture" doctrine as the basis of liability under Secs. 1981 and 1982. Although the doctrine is an accepted part of federal fair employment law, Armistead opposes its application to the housing claims in this case. It believes the extension is unwarranted.
 
 
 13
 The doctrine was first recognized in International Brotherhood of Teamsters v. United States, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), where the Supreme Court affirmed a finding that a common carrier and a union had violated Title VII by discriminatory hiring and promotion policies. While many of the company's employees had applied for promotions and been discriminatorily rejected, others had not applied because the company's discriminatory practices were well known to them. The company argued that the failure to apply barred recovery because the nonapplicants did not suffer direct harm from discrimination. Deciding which employees were entitled to relief, the Supreme Court had this to say:
 
 
 14
 [T]he company's assertion that a person who has not actually applied for a job can never be awarded seniority relief cannot prevail.... A consistently enforced discriminatory policy can surely deter job applications from those who are aware of it and are unwilling to subject themselves to the humiliation of explicit and certain rejection.... When a person's desire for a job is not translated into a formal application solely because of his unwillingness to engage in a futile gesture he is as much a victim of discrimination as is he who goes through the motions of submitting an application.
 
 
 15
 431 U.S. at 365-66, 97 S.Ct. at 1869-70. The Court remanded the case with instructions to determine which nonapplicants would have applied but for the company's practices. 431 U.S. at 368. The Court limited recovery to those employees whose demonstrable interest in the position was cut short by actual knowledge of unlawful practices.
 
 
 16
 Subsequent cases in our court and others demonstrate how integral to fair employment law the futile gesture idea has become. See, e.g., Holsey v. Armour & Co., 743 F.2d 199, 208-09 (4th Cir.1984); United States v. Gregory, 871 F.2d 1239, 1242 (4th Cir.1989); Babrocky v. Jewel Food Co., 773 F.2d 857, 867 (7th Cir.1985). It is now accepted that the failure to apply for a job does not preclude recovery if a claimant can demonstrate that he would have applied but for accurate knowledge of an employer's discrimination and that he would have been discriminatorily rejected had he actually applied. Of course, this is in addition to the other elements of a given employment claim such as possessing the necessary qualifications for the job.
 
 
 17
 Armistead insists that the futile gesture doctrine is an inappropriate basis for liability in this case for a number of reasons. Its first objection is simply to the novelty of using the doctrine for a housing discrimination claim.
 
 
 18
 Armistead's concern is ill-founded. Fair employment concepts are often imported into fair housing law. The foremost example is the prima facie proof test first established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), for fair employment, which has become a fundamental part of Title VIII and Secs. 1981 and 1982 fair housing law. See, e.g., Selden Apartments v. HUD, 785 F.2d 152, 159 (6th Cir.1986); Asbury v. Broyham, 866 F.2d 1276, 1279 (10th Cir.1989); Phiffer v. Proud Parrot Motor Hotel, Inc., 648 F.2d 548, 551 (9th Cir.1980). Although fair employment and fair housing statutes create and protect distinct rights, their similarities have traditionally facilitated the development of common or parallel methods of proof when appropriate. Consequently, we do not consider novelty a bar to the application of the doctrine.
 
 
 19
 Armistead contends that differences between typical housing and employment cases make an extension of the futile gesture doctrine unworkable. Armistead suggests that the doctrine fits the employment setting well because often the typical nonapplicant who sues is an employee or someone connected with the employer in a manner that separates the nonapplicant from the casual man on the street. This in turn usually means that it is the employer or someone closely associated with him who is the source of information about the challenged policy. These attributes tend to guarantee that the employer has an active hand in discouraging the application. By contrast, Armistead sees in this case many ills which will lead to voluminous, frivolous litigation over fair housing. Armistead emphasizes that Pinchback had no direct contact with it, learning of its policy through a real estate agent with no official ties to the corporation.
 
 
 20
 We do not share Armistead's concern about frivolous litigation in light of the careful treatment the district court has given the futile gesture theory as the basis for recovery. As viewed by the district court, the following elements must be satisfied to establish a violation of fair housing law by reliance on the futile gesture theory: the plaintiff must be a member of a racial minority who was a potential bona fide buyer of the property and financially able to purchase it at the time it was offered for sale; the owner discriminated against people of the plaintiff's race; the plaintiff was reliably informed of this policy of discrimination and would have taken steps to buy the property but for the discrimination; and the owner would have discriminated against the plaintiff had the plaintiff disclosed an interest in the property. 659 F.Supp. at 545-54. The district court found that Pinchback satisfied these elements of a fair housing claim based on the futile gesture theory. Its findings are amply supported by the record.
 
 
 21
 Pinchback was not required to do more than she did. She had no need to examine the property after Dailey told her no blacks could live there for precisely the same reasons why she had no need to exercise the futility of submitting an offer. The burden of humiliation occasioned by discrimination is heavy. When one has felt it as Pinchback did here, we cannot require the victim to press on meaninglessly.
 
 
 22
 To borrow from an illustration in Justice Stewart's Teamsters opinion, if Armistead should announce its policy of discrimination by a "Whites Only" sign, its "victims would not be limited to the few who ignored the sign and subjected themselves to personal rebuffs." 431 U.S. at 365, 97 S.Ct. at 1870. This is the crux of the futile gesture doctrine. The discrimination is no less because Armistead conveyed its message by subtle means. The victims who were reliably informed of Armistead's policy would not be limited to those who approached Armistead and were rebuffed. Pinchback, who was unwilling to engage in the futile gesture of submitting an offer for the property, is nonetheless a victim of discrimination. See 431 U.S. at 366, 97 S.Ct. at 1870.
 
 IV
 
 23
 Armistead complains that Pinchback failed to meet her initial prima facie burden under McDonnell Douglas and hence cannot prevail under Secs. 1981 or 1982. Not surprisingly, Armistead identifies as the missing elements Pinchback's failure to apply and the lack of an outright rejection from Armistead. It appears that Armistead is simply recasting its opposition to the futile gesture doctrine in terms of a prima facie showing.
 
 
 24
 The McDonnell Douglas scheme is a recognition that direct proof of unlawful discrimination is often difficult to obtain. It permits a plaintiff to make an initial showing, indirect in nature, that raises a presumption of illegality. This scheme is routinely used in housing and employment discrimination cases alike.
 
 
 25
 The district court concluded that Pinchback produced sufficient direct evidence of discrimination to prove Armistead violated Secs. 1981 and 1982. 689 F.Supp. at 549-50. Because she proved purposeful discrimination directly, largely through the testimony of former board members Ward and Conant, the McDonnell Douglas method of proof is irrelevant. All of this is explained in United States Postal Service Board v. Aikens, 460 U.S. 711, 713-14, 103 S.Ct. 1478, 1480-81, 75 L.Ed.2d 403 (1983), in which the Court said: "Because this case was fully tried on the merits, it is surprising to find the parties and the Court of Appeals still addressing the question whether Aikens made out a prima facie case. We think that by framing the issues in these terms, they have unnecessarily evaded the ultimate question of discrimination vel non." See also Trans World Airlines v. Thurston, 469 U.S. 111, 121, 105 S.Ct. 613, 621-22, 83 L.Ed.2d 523 (1985) ("[T]he McDonnell Douglas test is inapplicable where the plaintiff presents direct evidence of discrimination.").
 
 V
 
 26
 Armistead also assigns error to the award of $2,500 in compensatory damages. Before trial, Pinchback agreed to a consent decree with defendants Roy E. Jones Real Estate, Roy E. Jones and J.R. Diamond, and accepted $4,000 in exchange for a release of all her claims against those parties. The consent decree specifically reserved Pinchback's rights regarding Armistead for "any present or future claims."
 
 
 27
 Armistead argues that Md.Code Ann. Art. 50 Sec. 19 governs the $2,500 award. Under Sec. 19, if a tortfeasor makes a settlement payment, subsequent awards against unreleased joint tortfeasors must be reduced by the settlement amount. If Sec. 19 controls the settlement issue, the $4,000 paid pursuant to the consent decree ought to count toward the $2,500 judgment against Armistead. This would reduce what Armistead owes to zero.
 
 
 28
 This might be true if the $2,500 had been awarded for Armistead's violation of Maryland law. The district court specifically found otherwise, holding that "[t]his reduction [for settlement awards established by Sec. 19] has no effect here, since it is inapplicable to the damages awarded on the federal claims." 689 F.Supp. at 555. The district court decided that the violations of Secs. 1981 and 1982 were adequate by themselves to justify the $2,500 award.
 
 
 29
 The effect of the release on Pinchback's federal claims against Armistead is a question of federal law. See Gamewell Mfg. Inc. v. HVAC Supply, Inc., 715 F.2d 112, 114 n. 4 (4th Cir.1983). We believe the earlier settlement agreement neither reduces the judgment amount nor releases Armistead from its obligation to pay. First, there is no federal equivalent to Sec. 19 which suggests that the $2,500 should be reduced. Second, under federal law the settlement agreement only releases Armistead if Pinchback intended it to have that effect. See Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 343-48, 91 S.Ct. 795, 808-11, 28 L.Ed.2d 77 (1971); Avery v. United States, 829 F.2d 817, 819 (9th Cir.1987). The agreement clearly does not release Armistead and, in fact, contains an express reservation of all Pinchback's rights against the corporation. Accordingly, Armistead owes her the full amount of the judgment.
 
 VI
 
 30
 The district court also held that Armistead violated Md.Code Ann. Art. 49B, Sec. 25. 689 F.Supp. at 554-55. This aspect of the case involves the issue whether Maryland fair housing law confers a private right of action on the victims of discrimination. Because the Maryland Court of Appeals has not yet had an occasion to decide this question, we decline to address it. The award of damages to Pinchback and the grant of equitable relief rest firmly on federal law, so a decision on her state law claim is unnecessary at this stage of the litigation. Accordingly, with the exception of the court's ruling on the state law claim, the judgment is affirmed. The judgment finding liability under state law is vacated. Pinchback shall recover her costs.
 
 
 31
 AFFIRMED IN PART; VACATED IN PART.