John A. SHIRKEY, Plaintiff,

v.

EASTWIND COMMUNITY DEVELOPMENT CORPORATION, et al., Defendants.

Civil No. K–93–2791.

United States District Court, D. Maryland.

Oct. 4, 1996.

---

Michael L. Foreman and Kaplan, Heyman, Greenberg, Engelman & Belgrad, P.A., Baltimore, MD, for Plaintiff.

Bruce S. Harrison, Mark J. Swerdlin, and Shawe & Rosenthal, Baltimore, MD, for defendant National Division of the General Board of Global Ministries of the United Methodist Church.

H. Patrick Donohue and Armstrong, Donohue & Ceppos, Chartered, Rockville, MD, for defendant Baltimore–Washington Conference of the United Methodist Church.

FRANK A. KAUFMAN, Senior District Judge.

Plaintiff, John Shirkey seeks relief under 42 U.S.C. § 1981 ("§ 1981") against three defendants, the National Division of the General Board of Global Ministries of the United Methodist Church ("National"), the Baltimore–Washington Conference of the United Methodist Church ("Conference"), and the Eastwind Community Development Corporation ("Eastwind").[1] Shirkey alleges he was denied the opportunity to apply for a community development position with Eastwind due to racially restrictive criteria developed by National, approved by the Conference, and implemented by Eastwind. Pending before this Court for resolution are motions by Shirkey and defendants, National and the Conference, for summary judgment with regard to plaintiff's § 1981 claim. For the reasons stated herein, this Court will grant defendant Conference's motion for summary judgment, and plaintiff's cross-motion for summary judgment as to § 1981 liability against National, with regard to all of plaintiff's allegations.

## FACTS

Shirkey, a white male, served as a Minister of the United Methodist Church, from 1971–1993.[2] In 1988, Shirkey began doing community development work in East Baltimore where, through his relationship with Reverend John Carter ("Rev. Carter") of Eastern United Methodist Church ("Eastern"), he began to develop a community outreach program tied to Eastern.[3] The Conference awarded Eastern a small seed-money grant for the project and Shirkey was hired by Eastern's parish relations committee for the

---

1. Shirkey obtained a default judgment against Eastwind on January 13, 1995.

2. Shirkey Dep. at 19.

3. Shirkey Aff. ¶ 3.

duration of that funding.[4] In the fall of 1989, after the Conference grant money had run out, Shirkey accepted Eastern's offer of an unpaid appointment as its Director of Community Ministries.[5] Through the work of Shirkey, Rev. Carter and others, Eastwind, a non-profit organization, was created in 1990 to promote economic development, to reduce unemployment and to improve the quality of life within the East Baltimore community.[6] The community served by that project was at that time and thereafter predominately African–American.[7] Fifty percent of Eastwind's Board of Directors were members of Eastern, while the other fifty percent were residents of the surrounding community.[8]

At the time of Eastwind's formation, Shirkey had no commitments as to the role he might play in the new organization, although it was his assumption that he would begin immediately to function as both Eastwind's Director of Community Ministries and as its Executive Director, as those positions were merged together under Eastwind's bylaws.[9] In the summer of 1990, Shirkey was formally appointed to the unfunded position of Executive Director by the Eastwind Board of Directors, a position he held until his termination ten months later.[10]

After Eastwind's founding in 1990, Eastwind sought funding for a community developer position from National through a program known as the "Community Developer's Program."[11] That program consisted of two distinct components, a "Black Community Developer's" component and an "Indigenous Community Developer's" component.[12] Those two community developer programs were developed in the nineteen-sixties by the Methodist Church to enable predominately African–American and minority congregations to commit resources to addressing problems of racism and economic under-development in their respective communities.[13]

In order to receive funding through National's community developer programs, organizations like Eastwind were required to complete a written application for a project, have it approved by the Conference and then submit it to National's office of community developers. In early 1990, Eastwind submitted said application, seeking to be chosen as a Black Community Developer's site, citing the grave need for community development in its surrounding environs, and the positive impact a community developer could make.[14] Eastwind's project application was routed through the Conference, approved by the Conference on January 4, 1990, and then received by National on January 16, 1990.[15] The next step in the application procedure required Eastwind to entertain a "site visit" during which National's staff could confirm the commitment of Eastwind to the community developers project.[16] That site visit and National's initial approval of Eastwind's application were completed sometime in the spring of 1991.[17] Funds were released by National to Eastwind, after May 16, 1991, on receipt of a copy of the final job description which Eastwind had developed in order to guide the work of its community developer, the resume of the person selected to be the community developer, and a completed "Agreement of Intent," outlining Eastwind's assent to National's further requirements for maintaining a community developer program.[18]

4. Carter Dep. at 12.

5. Shirkey Dep. at 97–102.

6. Lawson Dep., Ex. 11 at unnumbered p. 1.

7. Shirkey Aff. ¶ 5.

8. Lawson Dep., Ex. 5 at unnumbered page 5.

9. Shirkey Dep. at 60–61; Lawson Dep., Ex. 11 at unnumbered page 17.

10. Shirkey Dep. at 45.

11. Shirkey Aff. ¶ 8.

12. Lawson Dep., Ex. 2 at unnumbered page 2.

13. Id.; Lawson Dep. at 21–23.

14. Lawson Dep., Ex. 6.

15. Id.

16. Lawson Dep. at 33–36.

17. Def.National's Mot.for Summ.J. at 10.

18. Lawson Dep. at 36–37. National's program coordinator, Ms. Lawson, raised concerns in a May 16, 1991 letter to Rev. Carter that East-

Sometime in March or April of 1991, Shirkey approached Rev. Carter, who at that time was also serving as a board member of Eastwind, and expressed Shirkey's interest in applying for the position of community developer.[19] Rev. Carter told Shirkey that he could not apply for the position of community developer, because National required the position to be filled by an African-American as a condition for their funding.[20] Rev. Carter further brought to Shirkey's attention certain documents which illustrated National's requirement that an African-American serve in the position of Black Community Developer.[21] Accordingly, Shirkey was not considered for the position, and Eastwind ultimately hired an African-American woman for the job.[22] Thereafter, Shirkey initiated his within § 1981 claims against National and the Conference.

## SUMMARY JUDGMENT

Defendants National and the Conference, and also the plaintiff, have filed summary judgment motions with regard to plaintiff's § 1981 claims. Summary judgment is appropriate where "there is no genuine issue of material fact and [where] the moving party is entitled to judgment as a matter of law." Fed.R.Civ.Pro. 56(c). The non-moving party is entitled to have "all reasonable inferences ... drawn in its respective favor." *Felty v. Graves–Humphreys Co.*, 818 F.2d 1126, 1129 (4th Cir.1987). The non-movant, however, in resisting summary judgment must "go beyond the pleadings and by [its] own affidavits,.... depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The Supreme Court, in *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), explained:

"The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict...."

477 U.S. at 252, 106 S.Ct. at 2512.

## DISCUSSION

 Plaintiff claims National's development and implementation of the "Black Community Developer's Program," and the Conference's approval of that program, denied him the opportunity to apply for the position of community developer with Eastwind in violation of § 1981.[23] Section 1981 prohibits race discrimination in all contractual relations. *See Runyon v. McCrary*, 427 U.S. 160, 168, 96 S.Ct. 2586, 2593, 49 L.Ed.2d 415 (1968). In that regard, "[s]ection 1981 protects a panoply of individuals rights, the primary one being the right to contract to earn a living." *Vietnamese Fishermen's Association v. The Knights of the Ku Klux Klan*, 518 F.Supp. 993, 1008 (S.D.Tex.1981) (citing *Johnson v. Railway Express Agency*, 421 U.S. 454, 459–60, 95 S.Ct. 1716, 1719–20, 44 L.Ed.2d 295 (1975)). Further, it is now settled law that a white person may sue under § 1981 for discrimination against her or him, in favor of an African-American. *See, e.g., McDonald v. Santa Fe Trail Transportation Co.*, 427 U.S. 273, 286–87, 96 S.Ct. 2574, 2581–82, 49 L.Ed.2d 493 (1976).

 In order for Shirkey to prevail in connection with his cross-motion for sum-

---

wind's initial candidate to fill the community developer's position lacked a commitment to the African-American community. After Eastwind addressed those concerns, Ms. Lawson approved the release of community developer funds. Lawson Dep., Ex. 12.

19. Shirkey Aff. ¶ 16.

20. Shirkey Aff. ¶ 16.

21. Carter Dep. at 65–66.

22. Shirkey Aff. ¶ 19–20.

23. The statute specifically provides:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses and exactions of every kind, and to no other.

mary judgment, he must show that he has been the victim of intentional discrimination. *See Patterson v. McLean Credit Union,* 491 U.S. 164, 186, 109 S.Ct. 2363, 2377–78, 105 L.Ed.2d 132 (1989); *General Building Contractors Association, Inc. v. Pennsylvania et al.,* 458 U.S. 375, 388–89, 102 S.Ct. 3141, 3148–49, 73 L.Ed.2d 835 (1982). "[U]nder § 1981, a plaintiff must prove a deprivation of one of the enumerated rights which, under similar circumstances, would have been accorded to a person of a different race and also that such deprivation was intentional and motivated by racial prejudice." *Robertson v. Maryland State Dept. of Personnel,* 481 F.Supp 108, 112 (D.Md.1978).

The ultimate question, therefore, is whether Shirkey can establish by a preponderance of the evidence that the discriminatory purposes of National and the Conference were a motivating factor behind his inability to enter into the employment contract with Eastwind. *See, e.g., Lewis v. Bethlehem Steel Corp.,* 440 F.Supp. 949, 966 (D.Md.1977). "Where direct evidence is available, problems of proof are no different than in other civil cases." *Goodman v. Lukens Steel Co.,* 777 F.2d 113, 130 (3d Cir.1985). Accordingly, Shirkey must provide this Court with either sufficient direct and/or circumstantial evidence that one or both of the defendants had the requisite discriminatory intent. *See Lewis,* 440 F.Supp. at 966.

National and the Conference argue that Shirkey cannot prevail in connection with his summary judgment motion for three reasons: (1) Shirkey has no standing to bring this § 1981 claim as he did not formally apply for the community developer position in question; (2) neither National or Conference are liable as they are not proper defendants and did not have the requisite intent to violate § 1981; and (3) this Court is barred from exercising its jurisdiction in this dispute on the basis of the First Amendment.

I. *Plaintiff has standing as his attempts to apply for the job of community developer were futile.*

■ Defendants posit that Shirkey has not presented a live controversy due to his al-leged failure to apply for the position of community developer. *See Flast v. Cohen,* 392 U.S. 83, 94–97, 88 S.Ct. 1942, 1949–51, 20 L.Ed.2d 947 (1968). That argument ignores the "futile gesture" doctrine established by the Supreme Court. *See International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 365–66, 97 S.Ct. 1843, 1869–70, 52 L.Ed.2d 396 (1977). "When a person's desire for a job is not translated into a formal application solely because of his unwillingness to engage in a futile gesture he is as much a victim of discrimination as is he who goes through the motions of submitting an application." *Id.,* at 365–66, 97 S.Ct. at 1869–70.

■ The Fourth Circuit has applied the "futile gesture" doctrine to § 1981 claims and found the doctrine to be well established in the employment discrimination field. *See Pinchback v. Armistead Homes Corp.,* 907 F.2d 1447, 1451 (4th Cir.1990). The doctrine requires a plaintiff to establish that but for reliable information regarding a policy of discrimination on the part of the employer, the plaintiff would have taken steps to apply for the position, and that the employer would have rejected the plaintiff in a discriminatory manner had the plaintiff applied for the job. *See Pinchback,* 907 F.2d at 1451–52.

■ Shirkey has presented ample evidence to meet that test. When Shirkey approached Reverend Carter about his interest in the position of community developer, he had every reason to believe Rev. Carter could accurately convey the criteria for the job, including, if any, racial restrictions. At the time, Rev. Carter was the pastor of Eastern United Methodist Church, the sponsoring church, a member of the local policy committee directing the community developers project,[24] and the project contact person for all communication between National's office of community developers and Eastwind.[25] Rev. Carter clearly informed Shirkey that his application would not be accepted because he was not "black." Further, Rev. Carter si-

---

24. Lawson Dep., Ex. 8 at numbered page 5.

25. Lawson Dep., Ex. 6 at numbered page 1.

multaneously directed Shirkey to documents produced by National which illustrated that program called for African–Americans to serve as community developers in communities which are largely African–American.[26] Nevertheless, Shirkey continued to inquire about the position,[27] until an African–American female, Ms. Melanie K. Smith–Taylor, was offered the position.[28]

Defendants' only line of defense is that Rev. Carter did not speak for National and the Conference. A review of the affidavits and exhibits before this Court, and of the law in this Circuit, exposes the weakness of that argument, particularly with regard to National. The Court in *Pinchback* found the African–American plaintiff was discouraged from visiting and from buying a home in Armistead Gardens, an all white cooperative community, by a real estate agent "with no official ties to the corporation." Nevertheless, Judge Butzner concluded that "[t]he discrimination is no less because Armistead conveyed its message by subtle means. The victims who were reliably informed of Armistead's policy would not be limited to those who approached Armistead and were rebuffed." *Pinchback*, 907 F.2d at 1452. Yet, that is exactly what defendants would require of Shirkey.[29] As *Pinchback* illustrates, that is not necessary where a third party accurately articulates a discriminatory policy on the part of the maker or perpetrator. Further, this Court finds it instructive that Judge Butzner held that liability existed in circumstances where the party informing the plaintiff of the discriminatory policy was a real estate agent, a party with allegiances sometimes potentially more divided than those involving Rev. Carter and the Methodist Church.

Given the futile gesture doctrine, and its application to this case, the critical question remains whether or not either or both of defendants National or the Conference en-

gaged in racial discrimination in administering the Black Community Developers Program. If Rev. Carter's remarks to Shirkey accurately reflected a racially restrictive policy developed by National, approved by the Conference, and implemented by Eastwind, then Shirkey's application would have been futile, and one or more of all of his within claims would be cognizable under § 1981.

## II. National's liability under § 1981

National's argument against liability rests on two arguments: (1) National is not an appropriate § 1981 defendant because Shirkey and National do not share an employer/employee relationship; and (2) Shirkey has failed to establish that National had the requisite intent to discriminate on the basis of race.

### A. National is a proper defendant

■ Although private actions under § 1981 which seek to vindicate the right to contract to earn a living have traditionally arisen out of an employment relationship, § 1981 has been applied where there is no direct employer/employee relationship but where the discriminating entity interfered with the plaintiff's ability to enter into an employment contract on the basis of race. *See Daniels v. Pipefitters' Assn. Local Union No. 597*, 945 F.2d 906, 914–915 (7th Cir.1991) (finding a racially discriminatory referral service impeded the plaintiff's ability to enter into employment contracts so as to violate § 1981). "In protecting the right to make contracts, section 1981 proscribes not only discrimination by the contracting party at the contract-formation stage but also discriminatory interference by a third party with the exercise of the right to make contracts." *Vakharia v. Swedish Covenant Hospital*, 765 F.Supp. 461, 471 (N.D.Ill.1991) (plaintiff's § 1981 claim against a hospital

26. Carter Dep. at 65–66.

27. Shirkey Aff. ¶ 18; Carter Dep. numbered page 68–69.

28. Shirkey Aff. ¶ 19–20.

29. See the contention set forth in Mot.for Summ.J. of Def.National page 18 ("Reverend Shirkey made no effort to verify Carter's state-

ments.... He did not try to meet with the ECDC [Eastwind] Personnel Committee regarding the subject; nor did he ask his Bishop [] if Carter's statements were accurate. Most importantly, he did not seek to speak with anyone at the National Division regarding this subject.").

was actionable where the hospital allegedly reduced the quantity and quality of plaintiff's anesthesiology caseload on the basis of race thus interfering with plaintiff's ability to make contracts with prospective patients). *See also Ladson v. Ulltra East Parking Corp.*, 853 F.Supp. 699, 702–03 (S.D.N.Y. 1994); *Kolb v. State of Ohio Dept. of Mental Retardation and Developmental*, 721 F.Supp. 885, 891–92 (N.D.Ohio 1989). Though defendants National and the Conference cite numerous cases to support their argument that barring an employer/employee relationship, there is no basis for § 1981 liability, those cases are inapplicable herein, since, in those cases the factual scenarios relate to whether or not a non-employer can be held vicariously liable where said non-employer had no hand in the actual discrimination. *See, e.g., Perry v. Manocherian*, 675 F.Supp. 1417, 1420, 1425–26 (S.D.N.Y.1987) (exonerating a non-profit entity which shared a principal with the entity charged with discrimination but which was managed separately); *Greason v. Southeastern R.R. Assoc.*, 650 F.Supp. 1, 3–4 (N.D.Ga.1986), aff'd, 813 F.2d 410 (11th Cir. 1987) (dismissing § 1981 claim against corporate entity where there was no evidence that the corporation played any part in the labor relations of plaintiff's employer, a corporation with which it shared some executives); *McAdoo v. Toll*, 591 F.Supp. 1399, 1404–05 (D.Md. 1984) (dismissing § 1981 action against only those individuals with no personal involvement and no supervisory role in alleged discrimination).

While Eastwind and National are indeed different corporate entities, the policy at issue in this case has been directly attributed to National. Therefore, National's liability is not predicated on any employer/employee relationship but rather hinges on whether or not National intentionally impeded Shirkey's ability to apply for the commu-

nity developer position. On the basis of all of the evidence before this Court, National cannot credibly claim an attenuated and distant relationship between Eastwind's implementation of the community developers program and its policies as communicated by its documents, its staff, and the history of the program.

## B. National's Intentional Discrimination

The Black Community Developer's Program is a program developed by National to help churches in African–American communities address the needs of their constituents. Eastwind targeted its community development efforts towards becoming an approved site for National's Black Community Developer Program. The position which Shirkey sought did not simply benefit from National's financial resources, but was in fact a result of National's creative efforts to fulfill its mission in African–American communities.[30]

In order to be awarded funds by National for a community developer, local organizations must follow a series of National mandates. A committee of persons from both the congregation and the local community must form the recipient organization.[31] That committee must gain National's approval for its project goals, its community developer job description, and its ultimate selection of the developer.[32] Even after National has released funds for a community developer, "developers are required to submit to National a Mid Year Report, Annual Report, Agreement of Intent, and a Human Relations Day Plan."[33] Further, should the local developer be terminated or resign, National terminates its relationship with the developer and funding of the local project.[34]

---

**30.** The funding for the position also reflects National's considerable role in the program's survival at Eastwind. Rather than seeking supplemental funding for an existing salary, Eastwind submitted a budget for National's approval which provided for $5,000 of the community developer salary to be funded by National, $5,000 to be funded by the Conference, and $11,000 by one or more unidentified sources. Lawson Dep., Ex. 8 at page 3.

**31.** Lawson Dep., Ex. 3 at unnumbered page 1.

**32.** Id. at unnumbered pages 1–5.

**33.** Lawson Dep., Ex. 2 at unnumbered page 8.

**34.** Id. at unnumbered page 8.

National's community developer office published documents which characterize the Black Community Developer Program as "consist[ing] of Asian, Black, Hispanic and Native American developers working in their communities."[35] Additionally, throughout National's literature, the Black Community Developer Program is described as fostering indigenous leadership, which the plaintiff credibly argues is a subtle means of communicating the requirement that the developer and the community served be racially identical.[36] The name of the program itself suggests the developers funded by the project must be "Black." Indeed, the Director of the Black Community Developer Program testified that from 1986 to 1995, no white person had been hired as a Black Community Developer.[37]

Rev. Carter, the project liaison between National and Eastwind, rebuffed Shirkey's inquiries as to the Black Community Developer position because he understood it to be National's requirement that the developer be "Black." Rev. Carter gained that impression from documents sent to him by National, his past experience with the program, and through the representations of one or more of National's employees.[38]

In sum, National was intricately involved in the Black Community Developers Program, both in its development and in its implementation at Eastwind. That level of involvement precludes National from avoiding responsibility for the effect of a discriminatory policy which it fostered. On the basis of the undisputed facts, this Court concludes that National intended to conduct the Black Community Developer Program in a racially discriminatory manner, and that that racially restrictive criteria prevented the plaintiff from entering into an employment contract

with Eastwind. Though this Court recognizes the value of fostering indigenous leadership in minority communities, it may not condone doing so through race discrimination.

## III. Conference liability under § 1981

The Conference seeks summary judgment against Shirkey on the basis of two points: (1) Shirkey has not established that the Conference intentionally discriminated against Shirkey; and (2) vicarious liability can not be imposed on the Conference as a result of the actions of Eastwind and National.

### A. Conference's Intentional Discrimination

Shirkey alleges that the Conference intentionally took part in a program of discrimination in which National engaged and which Eastwind implemented with regard to the Black Community Developer's Program, or, in the alternative, that the Conference had an informed policy of non-interference with the race-restricted policies of National and Eastwind.

The evidence before this court indicates that the Conference's involvement in Eastwind's community developer project was limited to two actions: first, the Conference approved Eastwind's application for a Black Community Developer before it was sent to National, and secondly, the Conference approved funds for the project after National approved Eastwind as a project site for a Black Community Developer.[39]

In order for the Conference to be held liable under § 1981, plaintiff must bring forward evidence which indicates that the Conference gave its approval to Eastwind's community developer application while know-

---

**35.** Lawson Dep., Ex. 4 at unnumbered page 2.

**36.** Lawson Dep., Ex. 2 at unnumbered page 4–5; Lawson Dep., Ex. 3 at unnumbered page 5.

**37.** Lawson Dep. at 52–53.

**38.** Carter Dep. at 18–19, 35, 47–50, 74–77. National maintains that Rev. Carter's statements are inadmissible as hearsay. This Court disagrees. Rev. Carter's statements are admissible non-hearsay as admissions of a party-opponent for such weight as the fact-finder might assign to

them. Fed.R.Evid. 801(d)(2)(A). However, even if this Court were to decide that Rev. Carter's statements regarding National's alleged policy of discrimination are inadmissable, this Court would in any event conclude that those statements are not needed in order to enable the plaintiff to gain summary judgment against National.

**39.** Plaintiff Cross–Mot. for Summ.J., Attach. H.

ing that the program would be administered in a racially discriminatory fashion. That the plaintiff has not done. For even if plaintiff's account of the events underlying this lawsuit are assumed to be true, plaintiff has not shown sufficient facts to establish volitional discrimination on the part of Conference. It is undisputed that the Conference's approval of Eastwind's application to National for funding of a Black Community Developer was required by Methodist Discipline procedure.[40] However, the Conference was not involved in the development of National's Black Community Developer program, and was not involved in the development of the job description used by Eastwind to hire its community developer.[41] Most importantly, plaintiff has not proffered any evidence that the Conference possessed or had knowledge of any of the documents produced by National which indicated the racial criteria which operated within the community developer program.[42] Nor did the Conference have any information as to the racial identity of Shirkey or of the person eventually hired by Eastwind to serve as community developer.[43]

Plaintiff's assertion that the Conference approved and aided the racially discriminatory manner in which the Black Community Developers project was implemented at Eastwind rests upon Rev. Carter's uncorroborated conjecture that the Conference "would know" about those matters.[44] That is not sufficient. In that regard, this Court concludes that, at best from plaintiff's point of view, there is a relevant and material dispute as to whether the Conference intentionally impeded Shirkey's ability to contract on the basis of race.

### B. Conference's Vicarious Liability

In the alternative, the Conference may be held vicariously liable for the actions of one or both of Eastwind and National if, as a principal, the Conference "had knowledge of the relevant circumstances and authorized, ratified, or approved the intentional [discriminatory] conduct." *Yates v. Hagerstown Lodge # 212 Order of Moose*, 878 F.Supp. 788, 798 (D.Md.1995), citing *Berger v. Iron Workers Reinforced Rodmen Local 201*, 843 F.2d 1395, 1430 (D.C.Cir. 1988). *See also Watson v. Fraternal Order of Eagles*, 915 F.2d 235, 244 (6th Cir.1990). In *Yates*, the Court, required both an agency relationship, and knowing authorization of the discriminatory conduct. As discussed *supra*, the plaintiff has not carried his burden of showing the needed knowledge by the Conference of discriminatory conduct by Eastwind and by National. Therefore, even assuming that plaintiff has sufficiently indicated an agency, partnership or other relevant relationship between Eastwind or National and the Conference, the Conference may not be held vicariously liable for the actions of National and Eastwind where such knowledge has not been sufficiently proffered by Shirkey.

### IV. Neither National nor the Conference are protected by the First Amendment

National and the Conference argue that this Court is precluded from examining the validity of Shirkey's § 1981 claim under the First Amendment of the United States Constitution. In so doing, they point to the language in our Constitution which provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof...." U.S. Const. Amend. I. Defendants National and the Conference argue that the exercise of this Court's jurisdiction over Shirkey's claim interferes with their respective free exercise of religion, including their prerogatives to choose the leaders of their affiliated institutions, and also that this Court's examination into Shirkey's claim inevitably involves an unconstitutional entanglement in church affairs.

---

40. Strait Dep. at 18, 42–43, 58.

41. Def.Conference Mot.for Summ.J., Ex. 4, Answers to Interrogatories, no. 7.

42. Def.Conference Mot.for Summ.J., Ex. 5, Defendant's Response to Plaintiff's Request for Production of Documents, Nos. 1–6; Ex. 4, Answers to Interrogatories, Nos. 8 and 14.

43. Id. Strait Dep. at 28.

44. Carter Dep. at 25.

Defendants emphasize a long line of cases which establish a virtual *per se* rule among courts to decline jurisdiction over employment disputes between churches and their clergy in the light of the Free Exercise Clause. *See, e.g., Young v. Northern Illinois Conference of United Methodist Church,* 21 F.3d 184, 185 (7th Cir.1994) (declining jurisdiction over a probationary minister's race and sex claims, citing the special relationship between a church and its ministers); *Minker v. Baltimore Annual Conference of United Methodist Church,* 894 F.2d 1354, 1357 (D.C.Cir.1990) (declining jurisdiction over a minister's age discrimination claim; "evaluation of the 'gifts and graces' of a minister must be left to ecclesiastical institutions." [45]); *McClure v. Salvation Army,* 460 F.2d 553, 558 (5th Cir.1972) (the application of Title VII to a minister's gender discrimination claim against her church is an infringement of the Free Exercise clause, because "[t]he relationship between an organized church and its ministers is its lifeblood" and therefore should remain outside the court's jurisdiction). The shield which the First Amendment provides for religious institutions in their dealings with their clergy, does not, however extend to a blanket exemption from discrimination laws. "The magnitude of the free exercise burden need not always obscure the magnitude of the state's interest embodied in Title VII." *Rayburn v. General Conference of Seventh–day Adventists,* 772 F.2d 1164, 1169 (4th Cir.1985). Consequent-

ly, courts have found the employment decisions of religious institutions subject to scrutiny where those decisions involved neither the clergy-church relationship, nor the right which religious institutions have to discriminate in favor of members of their religious communities, nor religious doctrine. *See, e.g., Geary v. Visitation of the Blessed Virgin Mary Parish School,* 7 F.3d 324, 331 (3d Cir.1993) (the application of the Age Discrimination in Employment Act (ADEA) to lay faculty of religious schools did not violate the First Amendment); *E.E.O.C. v. Mississippi College,* 626 F.2d 477, 485 (5th Cir. 1980) (the employment relationship between a religious college and its faculty is subject to Title VII, expressly noting that *McClure,* 460 F.2d 553, is limited "to the context of the church-minister relationship"). *See also E.E.O.C. v. Pacific Press Publishing Association,* 676 F.2d 1272, 1277 (9th Cir.1982) (a nonprofit religious publishing house violated Title VII by offering female employees different benefits from similarly situated male employees, noting that "Congress consistently rejected proposals to allow religious employers to discriminate on grounds other than religion. . . ."). Shirkey, though a minister, attempted to apply for the lay position of community developer. The job description which National approved for the position does not require the community developer to lead religious services, act as a pastoral counselor, or require specific religious training.[46] The Court concludes therefore that

---

**45.** "These gifts and graces include the pastor's 'experience and continuing education, professional experience, records of performance, [and] age.' " *Minker,* 894 F.2d at 1356 (quoting the United Methodist Book of Discipline).

**46.** *See* Lawson Dep., Ex. 3 at unnumbered page 2 (*"Criteria* for selections of a person to serve as a Black Community Developer is based on the job description which is developed by the pastor and policy committee and approved by the National Office of Community Developers."); Lawson Dep., Ex. 9 at unnumbered page 1–2:
JOB DESCRIPTION: *Community Developer*
*General Description*—The Community Developer will be from the indigenous population and will serve as community organizer and change agent around specific issues.
*Skills Required:* 1) Ability to relate to people, 2) Bachelor's degree preferred but not required, 3) Knowledge of the United Methodist Church, 4) Familiar with the political and so-

cial dynamics of Balto. City, 5) Willingness to commit at least two (2) years to the organization, 6) Basic computer knowledge, 7) Technical writing skills, 8) Financial and resource management, 9) Board training skills, 10) Program management skills, 11) Administrative management skills, 12) Public Speaking.
. . . .
*Responsibilities:* 1) To respond to the needs of the community residents, 2) To organize citizens for improvement in their neighborhoods . . . 6) Will strengthen the involvement of Eastern United Methodist Church in community change;
Lawson Dep., Ex. 2 at unnumbered page 7:
The principles of organizing for social justice from the community developers perspective is grounded in the theology of the church. And the consequent activities of local projects both reflect and enhance a 'doing' theology. The local church serves to gather, sustain, and to mobilize the energies of a 'total' community

the position of community developer is not the ministerial type of position which *Young, Minker,* and *McClure* seek to protect.[47]

Finally turning to the issue of unconstitutional entanglement in church affairs, the Supreme Court in *NLRB v. Catholic Bishop of Chicago,* 440 U.S. 490, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979), has provided a framework for determining whether a jurisdictional dispute can be solved on statutory grounds prior to an entanglement analysis. "First, a threshold question: would application of the statute present a significant risk of infringing the First Amendment? Second, the interpretive rule: is there a permissible construction of the statute that avoids the risk, or alternatively, is there a clear expression that Congress intended that the statute apply? And third: if the statute applies, does it violate the Religion Clause of the First Amendment." *Geary v. Visitation of the Blessed Virgin Mary Parish School,* 7 F.3d 324, 327 (3d Cir.1993) (citing *Catholic Bishop,* 440 U.S. at 501–06, 99 S.Ct. at 1319–21). *See also DeMarco v. Holy Cross High School,* 4 F.3d 166, 169 (2nd Cir.1993); *Rayburn,* 772 F.2d at 1171; *E.E.O.C. v. Pacific Press,* 676 F.2d at 1276.

In this case, this Court does not have to delve beyond the first prong of the *Catholic Bishop* inquiry. The application of § 1981 scrutiny to the Black Community Developers Program does not pose a significant risk of entanglement. This Court's inquiry involves the simple determination of whether or not the Black Community Developers Program as constructed by National and approved by the Conference operated in a racially discriminatory manner. Further, there is no conflict between § 1981's prohibition with regard to race discrimination and any proffered religious doctrine of the Methodist Church. *Accord Geary* at 328. In this case, since neither National nor the Conference has offered a religious doctrine or reason justifying the race restrictions in the community developers program,[48] neither defendant National or the Conference has carried the burden of successfully advocating a First Amendment objection concerning entanglement grounds. Absent a conflict between § 1981 and religious doctrine, the defendants' First Amendment objections to this suit must fail.

## Conclusion

Shirkey has met his burden of showing defendant National intentionally impeded his ability to form a contract with Eastwind on the basis of race. Further, Shirkey has standing to bring this case, and this Court's jurisdiction is not impeded by First Amendment considerations. Shirkey has not, however, carried his burden of proffering sufficient facts to show that the Conference knew

towards a 'new' community. From this vantage point the role of the local church is crucial to the ministry of the Community Developers Program.

**47.** As the First Circuit elaborated in *Rayburn,* a focus on the function of the position is appropriate and "[a]s a general rule, if the employee's primary duties consist of teaching, spreading the faith, church governance, supervision or a religious order, or supervision or participation in religious ritual and worship, he or she should be considered 'clergy.'" *Rayburn,* at 1169 (citation omitted). While the documents noted in footnote 46, *supra,* indicate that the Black Community Developer position is part of the Methodist Church's community ministry, that fact does not sufficiently distinguish the position from other administrative positions within the church which are critical to community ministry, such as a director of a soup kitchen, or a teacher in a religious school. *Accord DeMarco v. Holy Cross High School,* 4 F.3d 166, 172 (2nd Cir.1993) (involving a lay teacher whose duties included

leading students in prayers); *E.E.O.C. v. Mississippi College,* at 485

The College's faculty and staff do not function as ministers. The faculty members are not intermediaries between a church and its congregation. They neither attend to the religious needs of the faithful nor instruct students in the whole of religious doctrine. That Faculty members are expected to serve as exemplars of practicing Christians does not serve to make the terms and conditions of their employment matters of church administration and thus purely of ecclesiastical concern.

*See also Scharon v. St. Luke's Episcopal Presbyterian Hospitals,* 929 F.2d 360, 361 (8th Cir.1991) (finding critical to the determination that a hospital chaplain was not covered by ADEA and Title VII that the position required a Master of Divinity Degree, and that the job duties included 'pastoral counseling.... and liturgical services for persons in the hospital.') (citation omitted).

**48.** Rather, the Methodist Church has an express policy affirming principles of nondiscrimination. Shirkey Aff., Ex. 1 at 22, 114.

of the discriminatory manner in which National developed its Black Community Developer program or of the discriminatory manner in which that program was implemented at Eastwind.

This Court will shortly confer with counsel on both sides concerning issues of damages with respect to Shirkey's claim against National.